**SINGLETON SCHREIBER, LLP**
Srinivas "Vas" Hanumadass, California Bar No. 228547
vas@singletonschreiber.com
145 S. Spring Street, Suite 850
Los Angeles, California 90012
Telephone: 310-455-8351
Facsimile: 619-704-3552

**WORMINGTON & BOLLINGER**
Lennie F. Bollinger, Texas Bar No. 24076894*
LB@wormingtonlegal.com
212 E. Virginia Street
McKinney, Texas 75069
Telephone (972) 569-3930
Facsimile (972) 547-6440
*Pro Hac Vice application to be filed*

Attorneys for Plaintiffs
Additional Counsel listed on Signature Page

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTOINETTE LORENZ and MICHAEL WRIGHT, individually and as PERSONAL REPRESENTATIVES OF THE ESTATE OF JEANNETTE WRIGHT, deceased | Case No. _____ |
| Plaintiffs, | **PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND** |
| vs. | 1. Negligence and Negligent Failure to Warn; |
| URL PHARMA, INC.; UNITED RESEARCH LABORATORIES, INC.; MUTUAL PHARMACEUTICAL COMPANY, INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; SUN PHARMACEUTICAL HOLDINGS USA, INC.; SUN PHARMACEUTICAL INDUSTRIES LIMITED, | 2. Negligent Misrepresentation; 3. Gross Negligence; & 4. Fraud and Fraudulent Concealment |
| Defendants. | |

## <u>**Table of Contents**</u>

I.   NATURE OF THE CASE ..................................................................................... 4

II.  PARTIES ........................................................................................................... 5

III. JURISDICTION & VENUE................................................................................ 7

IV. FACTUAL ALLEGATIONS ............................................................................. 8

   A.  Decedent's Medical Course.......................................................................... 8

   B.  Laws Governing the Approval and Labeling of Prescription Drugs................. 10

   C.  Innovator Liability....................................................................................... 14

   D.  History of the Development of Bactrim and sulfamethoxazole trimethoprim (SMX-TMP) ................................................................................................ 15

   E.  U.S. Regulatory History of Bactrim.............................................................. 18

   F.  Safety Record of Bactrim ............................................................................ 19

   G.  Newly Acquired Safety Information–SJS/TEN Safety Data Concealed or Ignored by Defendants That Should Have Prompted Labeling Changes Regarding Higher/Increased Risks of SJS and TEN Associated with Bactrim . 25

   H.  Risk factors for Increased Risks of Hypersensitivity Reactions, Including SJS and TEN Associated with Bactrim................................................................... 32

   I.   Foreign Regulatory Actions and Foreign Labeling for Bactrim ........................ 35

   J.   Defendants Consciously Failed to Provide Physicians with Accurate and Essential Scientific Information for the Safe and Effective use of Bactrim and Fraudulently Concealed, or Misrepresented the Safety of Bactrim ................... 38

   K.  Decedent's Prescribing Physician Relied on Defendants' False and Misleading Safety  Information……………………………………………….………47

V.  CAUSES OF ACTION ...................................................................................... 52

A. Negligence and Failure to Warn……………………….…………………………52

B. Negligent Misrepresentation……………………….………………………...…55

C. Gross Negligence……………….……………………………………………58

D. Fraud and Fraud by Concealment .................................................................59

VI.   PRAYER FOR RELIEF ...................................................................................64

1. Compensatory, actual, and punitive damages, according to proof at trial; .......64

2. Survival, Loss of consortium and wrongful death damages according to proof at trial; .....................................................................................................................64

3. Attorney's fees, costs and costs of suit; and .....................................................64

4. Such other and further relief as the Court deems appropriate. ..........................64

Plaintiffs, Antoinette Lorenz and Michael Wright, individually and as Personal Representatives of the Estate of Jeannette Wright, deceased (Antoinette Lorez and Michael Wright are referred to herein as "Plaintiffs" and Jeannette Wright as "Decedent"), alleges the causes of action and damages complained of herein against Defendants, as follows:

## I. NATURE OF THE CASE

1. This case involves a pharmaceutical drug, sulfamethoxazole-trimethoprim ("SMX-TMP"), marketed under the brand name of Bactrim (hereinafter collectively referred to as "Bactrim"). Bactrim is commonly used to treat infections, including urinary tract infections.

2. Plaintiffs have information and belief that the Defendants failed to warn Decedent's prescribing healthcare provider and Decedent of new safety information about increased risks and greater severity, higher incidences and frequency of serious cutaneous adverse reactions, including Stevens-Johnson syndrome ("SJS"), toxic epidermal necrolysis ("TEN"), and higher risks of fatalities, and that certain populations have higher risks, and are predisposed to SJS and TEN reactions when taking Bactrim despite Defendants' knowledge of these said risks.

3.      Defendants are being sued under the theory of "innovator liability"[1] because they are responsible for the contents of all Bactrim warnings including the warnings of generic forms of Bactrim.

4.      Decedent was prescribed Bactrim in October of 2022 and as a result died of her SJS and TEN reaction to the generic formulation of Bactrim.  Both SJS and TEN are drug-induced mucocutaneous diseases that can cause permanent organ damage and failure, the outer skin to develop vesicles, blisters and can lead to skin sloughing (melt) off your body resembling 2nd and 3rd degree burns.  SJS and TEN can also lead to systemic inflammatory conditions and burns on the inside of your body on the mucosal surfaces, including the eyes, mouth, throat, esophagus, lungs, stomach, colon, urogenital and vagina, and carry one of the highest mortality rates for all adverse drug events that ranges from 30-80%.  SJS and TEN can cause catastrophic skin loss, renal failure, blindness, vaginal scarring and sterilization, acute respiratory failure and other pulmonary injuries, kidney failure, and death.

5.      Decedent suffered enormous pain and suffering before her death, essentially having her skin burned off the majority of her body, because of her Bactrim (SMX-TMP)-induced SJS and TEN, that was as a direct and proximate result of Defendants' wrongful conduct complained of herein.

## II. PARTIES

---

[1] As further discussed below, this case is brought against Defendants under "innovator liability" claims because Decedent ingested a generic form of Bactrim. *See T.H. (Minor) v. Novartis Pharm. Corp.*, 4 Cal.5th 145 (2017) (California Supreme Court confirming validity of innovator liability as the law of the State in California).

6.      Plaintiff Antoinette Lorenz is a resident of Riverside, California in Riverside County.  Plaintiff is the daughter of Decedent.

7.      Plaintiff Michael Wright is a resident of San Bernardino, California in Bernardino County.  Plaintiff is the son of Decedent.

8.      URL PHARMA, INC. is a corporation organized under the laws of Delaware.  It may be served through its registered agent: Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

9.      UNITED RESEARCH LABORATORIES, INC. is a corporation organized under the laws of Pennsylvania.  It may be served through an officer, a managing or general agent, or any other agent authorized by appointment or law to received service of process located at: 1100 Orthodox St., Philadelphia, Pennsylvania 19124.

10.     URL PHARMA, INC. and UNITED RESEARCH LABORATORIES, INC. are collectively referred to as "URL."

11.     MUTUAL PHARMACEUTICAL COMPANY, INC. ("Mutual") is a corporation organized under the laws of Delaware.  It may be served through its registered agent: Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

12.     SUN PHARMACEUTICAL INDUSTRIES, INC. is a corporation organized under the laws of Delaware.  It may be served through its registered agent: Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801

13.    SUN PHARMACEUTICAL HOLDINGS USA, INC. is a corporation organized under the laws of Delaware.  It may be served through its registered agent: Corporation Trust Company 251 Little Falls Drive, Wilmington, Delaware 19808.

14.    SUN PHARMACEUTICAL INDUSTRIES LIMITED is a company organized and existing under the laws of India, having its principal place of business at CTS No. 201 B/1, Western Express Highway, Goregaon I, Mumbai, Maharashtra, India 400063.

15.    SUN PHARMACEUTICAL INDUSTRIES, INC., SUN PHARMACEUTICAL HOLDINGS USA, INC., and SUN PHARMACEUTICAL INDUSTRIES LIMITED are collectively referred to as "Sun."

16.    Upon information and belief, Defendants collectively acted together to design, market, sell, advertise, label, manufacture and/or distribute Bactrim throughout California despite knowledge of the drug's dangerous and defective nature.

### III.    <u>JURISDICTION & VENUE</u>

17.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

18.    The Court has jurisdiction over Defendants because they engaged in business in this Judicial District and the State of California in connection with the occurrences giving rise to this action, and because the wrongful conduct challenged

herein was directed at, took place in, and/or had foreseeable injurious effects in this Judicial District and the State of California.[2]

19.    Specifically, Defendants made negligent and false representations complained of herein to Decedent's prescribing physician at his medical practice office located in this Judicial District.

20.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) in that Plaintiffs' claims arose from events taking place within this Judicial District.

## IV.    FACTUAL ALLEGATIONS

### A. Decedent's Medical Course

21.    On or about October 27, 2022, Decedent sought care from Dr. Mohammed Mahmood Ali for a possible urinary tract infection (UTI).   Dr. Ali prescribed Bactrim for decedent's UTI.. Decedent picked up the prescription from her pharmacy after the pharmacist had substituted the generic form of Bactrim, which is called sulfamethoxazole-trimethoprim, and she began consuming the generic version of Bactrim at her home in Riverside, California.

22.    On November 8, 2022, Decedent was taken to Riverside Community Hospital where it was noted that she had a chief complaint of diffuse rash throughout her body including her mouth after new antibiotics (Bactrim-SMX-TMP).   The decedent's skin began sloughing off and extensive wounds developed while at

---

[2] *White v. Novartis Pharmaceuticals Corp.*, Case No. CV-16-4300, 2018 WL 6133637, at *4 (C.D. Cal. March 7, 2018) (denying Novartis' renewed motion to dismiss for lack of jurisdiction in innovator liability SJS/TEN pharmaceutical case).

Riverside Community Hospital.  She was diagnosed with Bactrim induced toxic epidermal necrolysis (TEN).  The process to transfer Decedent to a hospital with a burn unit began shortly after her admission to Riverside Community Hospital.

23.    Decedent was transferred to Orange County Medical Center on November 12, 2022, for a higher level of care to treat her TEN and related complications.  Decedent was diagnosed with SJS and TEN at admission at Orange County Medical Center with a significant amount of third-degree partial to full thickness burns wounds with sloughing off of her skin over most of her body, including her face, eyes, lips, mouth, back, chest, abdomen, arms and legs, and urogenital areas.

24.    As a result of her skin loss from her SJS and TEN, she had to undergo multiple surgical grafting and debridement procedures at the burn unit.  She developed life-threatening complications associated with her SJS and TEN, including kidney failure, adult respiratory failure, resulting in treatment with kidney dialysis and on a ventilator.

25.    On 11/25/2022, she was diagnosed with 90-100% total body surface area sloughing of her skin, and was diagnosed with 100% TEN, after undergoing multiple skin debridement surgeries all over her body.  During her admission to the burn unit, she was consciously aware of her pain and suffering from her burn wounds. Despite these heroic efforts by the burn unit staff at Orange County Medical Center, decedent

died as a result of her Bactrim induced SJS/TEN and related sequelae on November 30, 2022.

**B. Laws Governing the Approval and Labeling of Prescription Drugs**

25.    The Federal Food, Drug, and Cosmetic Act ("FDCA" or the "Act") requires manufacturers that develop a new drug product to file a New Drug Application ("NDA") in order to obtain approval from the Food and Drug Administration ("FDA") before selling the drug in interstate commerce. 21 U.S.C. §355.

26.    A New Drug Application ("NDA") is the formal step a drug sponsor takes to request that the FDA consider approving a new drug for marketing in the United States.  21 C.F.R §314.50.  An NDA should include all animal and human data and analyses of the data, as well as information about how the drug behaves (pharmacokinetics and pharmacodynamics) in the body and how it is manufactured. 21 C.F.R §314.50.  A key component of the new drug approval process is the evaluation of the information regarding the safety and efficacy of the proposed drug. *Id.*  Thus, the NDA must contain a section reporting on foreign or domestic clinical data regarding the proposed new drug.  21 C.F.R §314.50(d)(5).

27.    The application must also contain a description and analysis of all clinical studies (controlled or uncontrolled) relied upon in evaluating the safety and efficacy of the drug.  21 C.F.R. §314.50(d)(5)(ii).  The NDA should also include "a description of any other data or information relevant to an evaluation of the safety

and effectiveness of the drug obtained or otherwise received by the applicant from any source, foreign or domestic, including commercial marketing experience, reports in the scientific literature, and unpublished scientific papers."    21 C.F.R. §314.50(d)(5)(iv).

28.    These FDA regulations in the premarketing phase require the drug sponsor to submit all safety information either to the IND or NDA – foreign or domestic – regardless of the source.[3]  Changes in foreign labeling should also be disclosed in the IND or NDA filings.  *Id.*

29.    Manufacturers with an approved NDA must continuously perform pharmacovigilance[4] and at least annually review all adverse drug experience information, domestic and foreign, obtained by or otherwise received by them from any source, including but not limited to post-marketing experience, reports in the scientific literature, and unpublished scientific papers. 21 C.F.R. §314.80(b).  NDA

---

[3] Good Review Practice: Clinical Review of Investigational New Drug Applications, FDA, CDER, December 2013, p. 15, also citing FDA regulations, 21 C.F.R. 312.32 and FDA Reviewer Guidance, "Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review," FDA CDER, February 2005.

[4] FDA has defined for the drug industry that "*pharmacovigilance*" principally involves the identification and evaluation of safety signals. A *safety signal* refers to a concern about an excess of adverse events compared to what would be expected to be associated with a product's use. Signals can arise from postmarketing data and other sources, such as preclinical data and events associated with other products in the same pharmacologic class. It is possible that even a single well documented case report can be viewed as a signal, particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug use. Signals generally indicate the need for further investigation, which may or may not lead to the conclusion that the product caused the event. After a safety signal is identified, it should be further assessed to determine whether it represents a potential safety risk and whether other action should be taken, including changing the label to warn about the new safety information and risks associated with the drug product. FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, March 2005.

---

PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

holders are also required to assess this safety information and analyze whether safety signals exist, including signals that should lead to labeling changes.

30.    Under what is known as the Changes Being Effected ("CBE") regulation, a manufacturer with an approved NDA can make certain changes to its prescription label without prior FDA approval by simply sending the FDA a "supplemental CBE-0 submission." 21 C.F.R. §314.70(c)(6)(iii).  Plaintiffs contend that while Defendants held the Bactrim NDA they could have (but did not) use the CBE-0 process to unilaterally (and without FDA consent) change the Bactrim label to warn for the risks addressed herein.

31.    Changes to the labeling a manufacturer can make pursuant to CBE without prior FDA approval include those to "add or strengthen a contraindication, warning, precaution, or adverse reactions for which the evidence of causal association satisfies the standard for inclusion in the labeling under §201.57(c) of this chapter" and "to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product." 21 C.F.R. §314.70(c)(6)(iii)(A) and (C).

32.    A manufacturer must revise its label "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitively established." 21 C.F.R. §201.57(c)(6).  Adverse reactions must be added to the label

where there "is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id*. at §201.57(c)(7).

33.    An August 22, 2008 amendment to these regulations provides that a CBE supplement to amend the labeling for an approved product must reflect "newly acquired information." 73 Fed. Reg. 49609. "Newly acquired information" is not limited to new data but also includes "new analysis of previously submitted data." "[I]f a sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'" *Id*. at 49607.

34.    The importance of the postmarketing efforts and the NDA submissions that are required throughout the marketing life of a drug product is to constantly ensure that the benefit of the drug outweighs the risk.  21 C.F.R. §§314.50, 314.80, and 314.81.  If new safety information from any source, including information from clinical trials, scientific literature or regulatory actions from foreign countries or other information not previously considered by the FDA, comes to light that calls that balance into question, the FDA requires sponsors (like Defendants) to initiate risk management strategies to address the safety risk, including updating the professional label.[5]

---

[5] The requirement to actively assess safety data and to update the product label is also set forth in 21 C.F.R. §201.56 and 21 C.F.R. §1.21, which require that the prescription labeling to be neither false nor misleading in any particular.

## C. Innovator Liability

35.     In California, drug manufacturers owe a legal duty to the consumers of generic versions of their brand name drug – the same duty they owe to consumers of their own drug. *T.H. (Minor) v. Novartis Pharm. Corp.*, 4 Cal.5th 145 (2017). Defendants owe this duty because it is foreseeable that California doctors, such as Decedent's, who prescribe Bactrim and its generic equivalents to California patients, will rely on misleading safety warnings, label information and drug marketing materials provided to or withheld from them by Defendants. *Id.* at 166-67; *Conte v. Wyeth, Inc.,* 168 Cal.App.4th 89 (2008).[6]

36.     Defendants were the innovator, New Drug Application ("NDA") holder[7] and Reference Listed Drug ("RLD") holder[8] of branded Bactrim products marketed in the U.S from 2004 – present.  As the drug's owners, Defendants were responsible for Bactrim marketing, safety-surveillance, regulatory reporting and labeling at all

---

[6] Every court that has directly addressed the issue of duty in California to consumers of generic pharmaceuticals has followed *Conte. In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, No. 2:11-202-DCR, 2012 WL 3842271, at *5-7 (E.D.Ky. Sept. 5, 2012) (applying California law); *Wendell v. Johnson & Johnson*, No. 09-CV-4124, 2013 WL 1741704 (N.D.Cal. Apr. 22, 2013); *Dorsett v. Sandoz, Inc.*, No. 06-CV-7821, 2009 WL 3633874, at *2 (C.D.Cal. Oct. 28, 2009); *see also Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 949 (9th Cir. 2012) (acknowledging the viability of *Conte* innovator liability claims under California law); *T.H. (Minor) v. Novartis Pharm. Corp.*, 199 Cal.Rptr.3d 768, 775-81 (Cal.App. 2016) aff'd 4 Cal.5th 145 (2017).
[7] The Food and Drug Administration's New Drug Application ("NDA") is the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing.
[8] A Reference Listed Drug ("RLD") is an approved drug product to which new generic versions are compared to show that they are bioequivalent. A drug company seeking approval to market a generic equivalent must refer to the RLD in its Abbreviated New Drug Application ("ANDA").

relevant times.[9]  Because the warnings on generic drug labels are required by law to be the same as those on the label of their brand-name drug counterparts, the U.S. warnings, instructions for use and the risk-benefit safety information regarding serious cutaneous adverse reactions ("SCAR") for Bactrim and the generic form ingested by Decedent were the same at the time the former was prescribed to, and the latter ingested by, Decedent.

**D. History of the Development of Bactrim and sulfamethoxazole trimethoprim (SMX-TMP)**

37.    Drs. Hitchings and Elion at Burroughs Wellcome and Company discovered the antibiotic trimethoprim's effect on bacterial infections on November 10, 1953. Shortly thereafter, the  Burroughs Wellcome Company was granted a U.S. patent on trimethoprim.

38.    In the early 1960s, very intensive research contacts regarding the drug research and development for anti-infective products began between Burroughs Wellcome & Company and Hoffman-La Roche.  Wellcome had previously made unsuccessful offers to work on trimethoprim with the Basel-based companies J.R. Geigy AG46 and Ciba AG47.  Both Geigy and Ciba companies had refused to collaborate with Wellcome on trimethoprim, as they regarded this drug's toxicity as unacceptable.  Even in 1963, when Wellcome approached Roche, there was still

---

[9] 21 C.F.R. §314.50 (NDA requirements); 21 C.F.R. §201.56-201.57 (general and specific labeling requirements for prescription labeling); 21 C.F.R. §314.70 (Changes Being Effected provision).

PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

considerable skepticism at Roche, particularly among microbiologists, about its safety and efficacy to treat any infection.

39.   In 1966-1967, Roche's goals were to defend its existing sulfonamide products and build upon new products in this class of drugs to expand their new drug products.   The two companies shared research information on the study of both sulfamethoxazole and trimethoprim.  Roche's microbiologist, Dr. Erica Böhni herself was initially worried about trimethoprim's toxicity: Specifically, she was afraid that potentiation of activity might entail potentiation of toxicity.  However, laboratory tests of the combination of trimethoprim with Gantanol's active ingredient, sulfamethoxazole, yielded increasingly persuasive results.

40.   However, it was soon found that a combination of five parts sulfamethoxazole to one part trimethoprim (Co-trimoxazole) could be administered in such small quantities that toxicity appeared acceptable.   However, even the first clinical trials failed to convince the critical scientists and they were afraid that trimethoprim might jeopardize the sulfonamide Gantanol and, with it, Roche's good reputation.  Despite Dr. Erika Böhni's growing enthusiasm, those urging caution in the Roche research department long held the upper hand with equally serious arguments.   In late 1966, however, Burroughs Wellcome issued an ultimatum to Roche demanding a rapid, joint launch of the combination product.   Otherwise, Wellcome would proceed to launch the product on its own.

41.    Gantrisin and Gantanol (previously marketed long acting sulfonamide antibiotics by Roche) were showing favorable growth, but the long-acting sulfonamides were at that time falling somewhat into disrepute because of their alleged adverse effects, such as severe allergic cutaneous and mucosal reactions (SJS) or extensive bullous detachment of the epidermis (Lyell syndrome).   Roche was obliged to recognize with some concern that the authorities in some countries were restricting the drugs' indications due to its risks of SJS and TEN, which soon dented the sales of Madribon as well and interfered with the further development of Fanasil (an anti-infective agent for cholera and leprosy, among other diseases).

42.    After the initial clinical trials were completed and certain applications were approved in Europe, Co-trimoxazole was jointly developed by Roche and Wellcome.   Roche began marketing co-trimoxazole under the brand name Bactrim since the early 1960s.   Since the early 1960's in Europe and other foreign countries, Bactrim was marketed by F. Hoffmann-La Roche Ltd, and Septrin by Burroughs Wellcome & Co.   Bactrim and Septrin (now known as Septra) were two drug products with same ingredients that combined the two antibiotic agents, sulfamethoxazole and trimethoprim, in a 5:1 ratio.   The Roche Bactrim product contained a combination of two active substances, sulfamethoxazole and trimethoprim.   By the 1960's, the drug combination had already been described as such in the literature, and so could no longer be patented.   Sulfamethoxazole was also a well-known active substance and was also no longer eligible for patent protection.

43.     In mid-June of 1968, the Roche Company determined that their co-trimoxazole product would be called Bactrim.  Also, in 1968, Burroughs Wellcome decided that the trade name for their separate co-trimoxazole would be called Septrin in Europe and Septra in the U.S. In October 1968, the sulfamethoxazole/trimethoprim combination was launched on the British market simultaneously under the brand names Septrin (Wellcome) and Bactrim (Roche) for approved indications initially been limited to severe urinary and respiratory infections.

44.     Roche then in 1968 undertook to go after the U.S. market by submitting applications in the U.S. for Bactrim because Roche considered the U.S. FDA requirements to have a more friendly attitude toward the risks of serious cutaneous reactions associated with long-acting sulfonamides as Europe had either banned or restricted their use of these products due to their elevated cutaneous toxicity.  Bactrim was approved by the FDA July 30, 1973.  The United States patent office awarded the drug a highly detailed patent (No 3,515,783) on June 2, 1970.

**E.  U.S. Regulatory History of Bactrim**

45.     From 1973, Hoffman-La Roche was the NDA holder for Bactrim until 2001, when Women First Healthcare ("WFHC") acquired the US rights for Bactrim from Roche.  WFHC obtained the rights to market Bactrim products within the U.S. starting in 2001.

46.     WFHC filed their supplemental new drug application dated January 23, 2002 submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for

Bactrim (trimethoprim and sulfamethoxazole) Tablets and DS (double strength) Tablets, as well as subsequent submissions dated August 9 and August 22, 2002 that responded to FDA's complete response letter that constituted a complete response to FDA's July 24, 2002 action letter.  This supplemental new drug application that was approved in October of 2002 provided for the transfer of drug product manufacturing from Roche Laboratories to Defendant Mutual.

47.    Defendant URL was established in 1946.  In the 1980s, Defendant URL started a generic-drug arm, Defendant Mutual.  The formulation, manufacturing site, manufacturing         equipment,      and      manufacturing      process      of sulfamethoxazole/trimethoprim tablets and Bactrim Tablets manufactured by Mutual Pharmaceuticals are the same except that Bactrim Tablets manufactured by Defendant Mutual had a different imprinting than the sulfamethoxazole/trimethoprim tablets manufactured by Defendant Mutual to reflect WFHC markings.

48.    On September 23, 2004, Defendant Sun, purchased the brand Bactrim from WFHC.  In November 2012, Defendant Sun purchased Defendant URL and Defendant Mutual from Takeda Pharmaceuticals making Defendant Sun the NDA holder of Bactrim products sold in the U.S.

**F. Safety Record of Bactrim**

49.    A long and comprehensive record of safety concerns exists concerning the risk of serious cutaneous adverse reactions ("SCAR") events like SJS, TEN, DRESS or Drug Reaction Eosinophilic Systemic Syndrome, or hypersensitivity

syndrome (HSS) associated with sulfonamides, including Bactrim, that both original innovators, Roche and GSK knew of during the 1960's through the early 2000's.

50.    Starting in 1967, Lyell et al. reported on their experience with Lyell Syndrome cases (toxic epidermal necrolysis) reporting on a case series of 128 reports of Lyell syndrome in the U.K. in the 1950-1960's.  His series reported 15 patients with drug-induced TEN caused by SMX-TMP and noted that there was a mortality rate of 22% owing mostly to patients with SMX-TMP induced TEN.  He reported that in the U.K. that SMX-TMP caused more cases of TEN than any other drug studied in the U.K.

51.    In 1968, there was a peer-reviewed paper reporting on a mass distribution of a long-acting sulfonamide drug used as a prophylaxis for meningococcal meningitis in Morocco Africa.  This long-acting sulfonamide had been used in 100,000 persons and there were skin reactions in 997 persons with dozens of SJS and TEN cases that resulted in 11 deaths.  Another paper reported on a mass distribution of a long-acting sulfonamide distributed to 149,000 persons in Mozambique for the prevention of cholera in which there were 22 cases of SJS and 3 deaths.

52.    Through the 1970's, many scientific articles reported on the increasing risks of serious cutaneous adverse reactions, including SJS and TEN associated with sulfonamide products, like Bactrim.  In 1972, French physicians reported on 23 reports of TEN associated with SMX-TMP.  Swedish scientists also reported on

serious bullous reactions associated with long-acting sulfonamides, including SMX-TMP reporting that they had a high rate of incidence in their country in 1972.

53.    In the early to mid-1980's, Fansidar (which was a sulfonamide anti-malaria drug) reported on increased frequency of severe adverse cutaneous reactions. Between 1982 and 1985, 24 cases of erythema multiforme, Stevens-Johnson syndrome, and toxic epidermal necrolysis were documented among American travelers using Fansidar.  Seven of these reactions were fatal. Available data indicate that the incidence of fatal cutaneous reactions associated with the use of Fansidar among American travelers ranges from 1/11,000 to 1/25,000 users.  These severe cutaneous reactions were associated with Fansidar when used as once-weekly prophylaxis.  When a combination of sulfadoxine and pyrimethamine (Fansidar) was used for malaria prophylaxis, the incidence of severe skin reaction was estimated to reach 1 in 5000 to 10,000 population with fatalities in 1 in 20,000 to 50,000.  Due to the incidence of SJS and TEN and serious skin reactions, Fansidar was withdrawn or restricted in its use in worldwide markets, including the U.S.

54.    In 1987, Schopf et al reported that SMX-TMP was the most frequent cause of SJS and TEN in Germany with 41 total patients developing SJS or TEN.  The incidence of SJS and TEN associated with SMX-TMP was 2 per 100,000 and was one of the top highest incidence of all drugs causing SJS and TEN in Germany at that time.

55.     Roujeau et al. reported in 1987 on their clinical experience that between 1972 and 1985, where 87 patients with toxic epidermal necrolysis (TEN) were admitted to the dermatological intensive care unit at Hôpital Henri Mondor, Créteil, France.  They noted that there were 25 patients with TEN caused by SMX-TMP, and the calculated frequency remained constant over that decade of SMX-TMP induced TEN.  In France, the incidence of TEN associated with SMX-TMP was 12 per million doses sold in France.  They also noted that one sulfonamide antibiotic, sulfadiazine had been restricted in its use due to increased risks of SJS and TEN.

56.     Infectious disease physicians in Germany published a paper in 1987 analyzing the risks and benefits of prescribing Bactrim and using the German regulations pertaining to a dangerous drug where the risks exceed the benefits and should not be used, they concluded that based on the safety record of Bactrim that it was a drug with risks that exceeded its approved benefits (treating urinary tract infections and other infections).  They cited to the paper by Schopf in part as a basis to support this statement on its risks.

57.     Starting in the 1990's, many papers started to identify Bactrim as the leading cause of SJS and TEN in the U.S. and American medical articles.  By 1990, Roujeau et al. reported that that sulfonamide antibiotics, like Bactrim were the leading cause of SJS and TEN in Europe.

58.     In the U.S., an epidemiological analysis was performed on incidence of erythema multiforme, SJS and TEN from 1972-1986.  This paper published in 1990

reported that the incidence of serious skin reactions resulting in hospitalized EM, SJS and TEN for SMX-TMP was 3 per 100,000 or 30 per million.  The background incidence for SCAR is 1-6 per million, so this frequency of SCAR for SMX-TMP was 5 to 29 times higher than the background rate of all SCAR events in the U.S.

59.    These same U.S. authors evaluated the incidence of outpatient use of SMX-TMP developing hospitalized EM, SJS and TEN to be 26 per 100,000 or 260 per million.  This is far higher frequency of SCAR than was calculated for Bextra by almost 200 times higher, and Bextra was pulled from the market by Pfizer due to its high rate of SCAR events, including SJS and TEN.

60.    Roujeau had reported that by 1994, that at least 30% of TEN cases reported involved antibacterial drugs like SMX-TMP, and that up to 5%-6% of patients starting a sulfonamide would develop SJS and TEN.

61.    Roujea, et al. reported in 1992 about their clinical experience in the 1980's with the use of SMX-TMP in AIDS patients and reported on 15 reports of TEN associated with sulfonamides, including many with SMX-TMP.  They calculated a very elevated prevalence of TEN associated specifically with SMX-TMP of 980 in one million person years.  Again, they noted a mortality rate from TEN to be high at 22% mostly due to SMX-TMP induced TEN.  They concluded that patients with HIV were at greater risks of developing SJS and TEN from SMX-TMP.

62.    Another paper by Roujeau et al. published in 1992 reported on their experience from 1981-1985 of elderly and TEN in France.  They found that TEN induced by SMX-TMP was the leading cause among antibacterial drugs in the elderly.

63.    Correia et al published their experience in 1993 on the patterns of TEN in France from 1985-1991 compared to 1972-1985, and found that sulfonamides, including SMX-TMP now was the highest rank of all drugs to cause TEN.

64.    By 1994, the SCAR study group had evaluated the risks of SJS and TEN using a case-control methodology and Roujeau reported in 1994 that in his experience that SMX-TMP had more reports of SJS and TEN than any other drug in France.

65.    Also, several papers in the 1990's confirmed that the rate of SCAR for patients exposed to SMX-TMP was associated with adverse events in 3 to 5% of all courses given to patients and in 44 to 83% of patient infected with the HIV.

66.    In 1994, Drs. Jean Claude Roujeau and Dr. Robert Stern published their review on severe cutaneous adverse reactions to drugs, including on SJS and TEN in the New England Journal of Medicine.  They noted that SMX-TMP carried one of the highest risks and incidence of almost all drugs for causing SJS and TEN.  They recommended that drugs with high risks of SJS and TEN should be identified, relabeled to reflect these risks, or withdrawn from the market.

67.    Starting in the 1990's, research groups were undertaking in vitro studies to better understand the mechanism of SCAR conditions like SJS and TEN from drugs, and there was a huge interest in determining the pathophysiological cause of

SJS and TEN from sulfonamide antibiotics, like Bactrim, especially in vulnerable populations like HIV positive patients. European investigators like Dr. Roujeau and Canadian investigators like Drs. Shear, Spielberg and Manuela Neuman published their results.

68.    Collectively, the research groups proved that patients exposed to SMX-TMP would induce the oxidative metabolism of sulfonamide agents by cytochrome P450 enzymes which produces a reactive metabolite that is toxic to lymphocytes. This hydroxylamine can covalently bind to cell macromolecules and is detoxified in part by conjugation with glutathione. Lymphocytes from a patient with glutathione synthetase deficiency display increased toxicity from sulfadiazine metabolites generated by a hepatic microsomal system. One theory is that an imbalance in bioactivation and detoxification processes that result in an accumulation of reactive intermediates is necessary but not sufficient for the development of SJS and TEN. In most cases, this imbalance is manifested as impairment in detoxification capacity.

69.    Several in vitro laboratory tests were created like the Lymphocyte toxicity assay based upon the capacity of a mitochondrial enzyme to be activated. Therefore, the mitochondria play a pivotal role in detoxification.

**G. Newly Acquired Safety Information–SJS/TEN Safety Data Concealed or Ignored by Defendants That Should Have Prompted Labeling Changes Regarding Higher/Increased Risks of SJS and TEN Associated with Bactrim**

70.    Starting in 1995, for the very first time, a well-respected group of dermatologists and epidemiologists used valid and reliable methodology to quantify the level of risks of SJS and TEN associated with specific medications, including Bactrim.  Along with this new safety information, there were many different papers published that discussed risks to subpopulations and risk factors identified that increase the risks of SJS and TEN from Bactrim that should have warranted labeling changes to reflect this new safety information.  Defendants, since 1995, have not revised their labeling for Bactrim at any time through the present to reflect this new safety information, and this new safety information was not communicated to prescribing physicians, including Decedent's prescribing physician prior to October of 2022.

71.    The SCAR Study Group 1995 was the very first international validated case-control study was undertaken to evaluate the risks of medications in causing SJS and TEN between 1989-1993 in European countries.  This study calculated the relative risks of SJS and TEN to specific medications for the first time, so these results were new safety information compared to prior results of safety information for Bactrim.

72.    The SCAR study preliminary results were published in the New England Journal of Medicine in 1995.

73.    The SCAR Study reported that sulfonamide antibiotics, including SMX-TMP carried the highest relative risks of any other drug marketed in the world with a

relative risks of 160 for SMX-TMP.  This means that a patient would be 160 times more likely to develop SJS and TEN from SMX-TMP, compared to using other antibiotics with substantially lower risks of SJS and TEN.  In fact, the authors of the SCAR study noted that one of the purposes of the study was to allow drug companies like the Defendants to provide warnings to prescribing physicians and to patients to allow them to choose a safer alternative medication to those drugs with high risks of SJS and TEN.

74.    However, Defendants never disclosed the results of the SCAR Study which reported the highest risks of SJS and TEN from SMX-TMP compared to any other drug in the world, and higher risks than any other antibiotics, and Defendants failed to disclose this important new safety information   in their respective professional labeling for Bactrim to any U.S. physician ever.  To this day, this safety information is not contained in the U.S. labeling for SMX-TMP, including Bactrim labeling.

75.    It was noted that since 1995, the use of Bactrim had decreased substantially in UK due to these results being reported by the SCAR Study group, but not in the U.S., primarily because Defendants failed to revise their labeling to provide the new safety information from the SCAR Study into their respective labeling to prescribing physicians in the U.S., including to Decedent's prescribing physician.

76.    By 2000, a validated in vitro assay was established for the LTA to reliably test for predisposition to having this metabolic deficiency to SMX-TMP in

normal patients and in patients HIV positive.  Neuman et al. concluded that this in vitro LTA is a useful ancillary diagnostic tool for predicting who would develop this clinical symptom complex of SJS and TEN.  They noted that it may provide a better understanding of the mechanisms in patients who have had these reactions.   They recommended that populations at risk, such as HIV-infected persons who have 10-100 times higher risks of SJS and TEN, and who have a need for SMX-TMP medications as prophylaxis against infection should be tested with the LTA to establish the possibility of safe use.  It should be noted that since 2000, U.S. patients can be tested before they started Bactrim or the generic equivalents, but Defendants have never informed prescribers of this valuable test that could prevent the occurrence of SJS and TEN, and which is preventable using the LTA.

77.    In 2001, a very important paper was published by Roujeau and his colleagues in France.  They undertook to study whether stopping a drug early when a rash or blister forms in the development of SJS and TEN, whether this would impact on mortality.  They evaluated drugs with short half-lives versus drugs with long half-lives and measured the mortality of SJS and TEN of stopping drug early versus late in the process.  They concluded that with drugs of short half-lives, such as Bactrim, that if you stopped the drug early you would reduce the risk of death by over 30% per day. In fact, this study used 22 SJS and TEN patients alone to prove this fact.

78.    This finding was important because objectively they proved that being aware of the risks of SJS and TEN before prescribing and then knowing that the risks

of SJS and TEN that death was preventable in short half-lives drugs if you stopped it early after developing rash or first blister would reduce the risks of mortality and morbidity. This was also new safety information that was never disclosed by Defendants in their professional labeling for Bactrim.

79. By 2004, peer-reviewed literature was identifying that females had higher risks of SJS and TEN than males, and that the gender difference was substantially higher in females. Roujeau also reported that African-Americans also had higher risks and incidence of SCAR, including SJS and TEN. This was new safety information that was also never disclosed by Defendants in their professional labeling for Bactrim.

80. In 2005, Dr. Stern reported on his analysis of the incidence of hospitalized EM, SJS and TEN in the U.S. reporting a strikingly elevated incidence of 16 per million. Compared to the background rate of SJS and TEN at 1-6 per million, the incidence of EM, SJS and TEN in the U.S. was now as 2-15 times higher than before. This incidence of SCAR was considered by Dr. Stern to no longer be rare. He noted that there were 5000 hospitalizations each year for EM, SJS and TEN in the U.S. and over 100,000 outpatient visits to emergency rooms and clinics each year for EM, SJS and TEN. Defendants have ignored this increased incidence of SCAR hospitalizations and outpatient visits in the U.S. in their respective labeling for Bactrim.

81. In 2007, the EuroSCAR study group published their results from their second case-control study that followed the SCAR study in 1995 to evaluate

additional newer drugs, the older drugs and highly suspected drugs like Bactrim to see if their relative risks for SJS and TEN had changed. In 1995, a first case–control study (SCAR-study) assessed the risks of SJS and TEN related to medications (Roujeau et al., 1995). High relative risks (RRs) were observed for anti-infective sulfonamides (especially cotrimoxazole). They noted that these results from the SCAR study led to some restrictions of use for the cotrimoxazole products in Europe in the interval of time between studies.

82. The EuroSCAR study involved new countries like Israel and the Netherlands in addition to France, Germany and Italy. They confirmed again in a new population that cotrimoxazole products had high relative risks with the univariate RR reported to be 120 for all cases, and the RR to be greater than 20 for patients using the drug for less than 8 weeks of therapy, and the RR was still elevated in use of the drug greater than 8 weeks.

83. For the first time, the EuroSCAR authors considered cotrimoxazole or SMX-TMP products to have such a high relative risks that exceeded the benefits that they recommended that physicians be told that due these high risks of SJS and TEN that safer alternative antibiotics should be considered as first line agents before cotrimoxazole products. They also suggested that these results should be used by the drug companies to inform drug companies to provide these recommendations to drug regulatory authorities and to physicians.

84.     Defendants ignored this new safety information from the EuroSCAR study that provided additional relative risks and prescribing recommendations for the restriction of use of cotrimoxazole or SMX-TMP products for its approved indications in treating infections.   Plaintiffs contend that Defendants consciously withheld this safety data from U.S. physicians, including the Bactrim prescriber for Decedent in October of 2022.   Had this safety information been disclosed to the prescribing physician for Decedent, Decedent would not have received Bactrim that caused her injuries.

85.     In 2011, Dr. Mockenhaupt et al. reported on her analysis of the US FDA AERS database reviewing whether there was a safety signal for SJS and TEN associated with medications that had shown high risks for SJS and TEN.   One of those high risks drugs was Bactrim and its generic equivalents.   They reported that between 1969-2009 that there were over 900 reports of SJS and TEN and that the EB05 signal threshold was over 13, which means that for these potentially fatal reactions, SJS and TEN, were reported 13 times higher than expected to be reported among all adverse effects reported combined for Bactrim and generic equivalents.   Bactrim and its generic equivalents had more reports than most all other drugs, except for Lamictal and Dilantin.   Defendants ignored this safety signal based on spontaneous reporting of SJS and TEN in the U.S. FDA database and did nothing to inform prescribers of this new safety information demonstrating a much higher reporting rate of SJS and TEN than before.

86.    Defendants have known about the higher risks of SJS and TEN, but never warned about this higher risks not only among all other drugs, but certainly higher than most all other antibiotics.  Plaintiffs contend that Defendants have concealed the higher risks of SJS and TEN associated with Bactrim along with ignoring new safety information coming from case-control studies, case series, and postmarketing reporting.

87.    The U.S. Society for Hospital Dermatologists compiled a database of 405 U.S. SJS/TEN cases between 2000 and 2015, with most patients treated from 2010 onward.  They noted that medications were the most common cause of SJS/TEN in this cohort, accounting for 91.3% of cases, and Bactrim was most often implicated in the U.S. cases of SJS and TEN (26.0%).

88.    In 2018, members of the RegiSCAR group published their case-control study evaluating the updated risks of SJS and TEN with drugs.  They found that SMX-TMP had 1000 times greater risks of SJS and TEN than previously detected. These increased risks of SJS and TEN being 1000 times higher was newly acquired safety information that should have been updated into the labeling for the branded drug Bactrim.

**H. Risk factors for Increased Risks of Hypersensitivity Reactions, Including SJS and TEN Associated with Bactrim**

89.    In addition to Bactrim belonging to the sulfonamide antibacterial drugs which has the highest relative risks for SJS and TEN, more than any other drug class;

or Bactrim having the highest individual relative risks compared to all other drugs, certain subpopulations are more susceptible to Bactrim induced SJS and TEN.

90.    These risk factors have been well published but ignored by Defendants, as the Bactrim labeling does not address the unique risk factors for certain subpopulations, even though Defendants are required to address these factors pursuant to FDA regulations.

91.    Defendants consciously decided to conceal much of this new safety information that has emerged over the last 15-20 years. Below are select pertinent risk factors for SCAR events, including SJS and TEN associated with Bactrim:

i.    **Females Have Higher Risks of SJS and TEN**

92.    Since 1980 and throughout the time leading up to 2016, the scientific literature has consistently confirmed that females have a higher incidence and risks of SJS and TEN compared to males. Below is a table of the literature reporting the significant gender difference between females and males across all populations around the world, including the U.S. population:

*FEMALES HAVE HIGHER FREQUENCY/RISKS OF HOSPITALIZED SJS AND TEN:*
*SIGNIFICANT GENDER DIFFERENCE*

| PUBLICATION | STUDY PERIOD | FEMALE/MALE RATIO | % FEMALE | COUNTRY |
|---|---|---|---|---|
| Roujeau, et al. 1990 | 1981-1985 | 0.6 or 1.5/1 | 60% | France |
| Naldi, et al. 1990 | 1981-1985 | 2:1 | | Italy |
| Schopf, et al. 1991 | 1981-1985 | 2:1 | | Germany |
| Power, et al. 1995 | 1960-1994 | | 60%-62% | U.S. |
| Mockenhaupt, et al. 1996 | 1990-1995 | | 55-70% | German Registry |
| Rzany, et al. 1999 SCAR-AEDs | 1989-1993 | | 56% | European |
| Sheridan, et al. 1999 Pediatric | 1991-1998 | 4:1 | | U.S. |
| Aquier-Dinant, 2002 | 1989-1995 | 0.7-0.5; 53%-62% women | | France |
| Stern, RS 2005 | 1995-2001 | | 52%-71 | U.S. |
| Gravante, et al. | 1995-2005 | | 65.6 | Italy |
| Mockenhaupt, 2008 EuroSCAR | 1997-2001 | | 62% | European, Israel |
| Fen Gau, 2008 | 1997-2004 | | 51.4% | Taiwan |
| Mockenhaupt, M, 2011 | Review | | 65% | Germany |
| Weinand, et al. 2013 | 1984-2011 | | 3:2-SJS & 11:9-TEN | Germany |
| Von Wild, et al. 2013 | 2001-2011 | 2:1 | | Germany/German Registry |
| Mockenhaupt, M, 2015 | Review | | Greater than 50% | Most Countries |
| Hsu, et al. 2016 | 2009-2012 | | 58% | U.S. |
| Diphoorn, et al. 2016 | 2009-2014 | 4:1 | | Italy |

Diphoorn et al. (Incidence, causative factors and mortality rates of Stevens-Johnson syndrome (SJS) and toxic epidermal necrolysis (TEN) in northern Italy: Data from the REACT registry. Pharmacoepidemiol Drug Saf 25: 196-203, 2016) reported that there was a significant gender difference in the incidence of SJS and TEN with a greater incidence in females. They noted that the gender differences are confirmed by findings in previous studies, where a higher risk for women is described, especially for TEN. Mockenhaupt. The current understanding of Stevens–Johnson syndrome and toxic epidermal necrolysis. Expert Rev Clin Immunol 7: 803–813, 2011. doi:10.1586/eci.11.66.; Paulman and Mockenhaupt. Severe drug-induced skin reactions: Clinical features, diagnosis, etiology and therapy. J Dtsch Dermatol Ges 13: 625–643, 2015. doi:10.1111/ddg.12747; Weinand et al. 27 years of a single burn center experience with SJS and TEN: Analysis of mortality risks for causative agents

Burns 39: 1449–1455, 2013. doi:10.1016/j.burns.2013.03.011; French and Prins. Erythema multiforme, Stevens–Johnson syndrome and toxic epidermal necrolysis. In Dermatology, 2nd ed. Bolognia JL, Jorizzo JL, Rapini RP (eds). Elsevier: Philadelphia, PA, 2008; 287–300.)

93.    Nearly 60% of all reported SJS and TEN cases in the U.S. involved women, which was consistent with Dr. Stern's findings reported in 2005, that women in the U.S. had a higher incidence of SJS and TEN.

94.    Bactrim induced SJS and TEN also has shown greater incidence among females compared to males in the published case series and case control studies.

95.    Since SJS and TEN disproportionately affect women in the U.S., the risks of SJS and TEN from Bactrim should be addressed by Defendants in their U.S. labeling for Bactrim.

**ii.  Risk to Elderly of Bactrim induced SJS/TEN**

96.    Since 1995, several different scientific investigations have revealed that patients exposed to SMX-TMP in the elderly have much higher risks of fatalities than younger patients.  Additionally, the incidence of serious cutaneous adverse reactions are much higher in the elderly population who have taken SMX-TMP and has been reported to be higher than previously known.

**I.  Foreign Regulatory Actions and Foreign Labeling for Bactrim**

97.    Since the 1970's, European drug regulatory authorities have expressed concern about the overall risk-benefit profile of Bactrim because its cutaneous toxicity

was frequent and involved potentially fatal reactions like SJS and TEN. Some foreign countries like the U.K. have restricted the use of Bactrim to only be used for severe infections and only after other safer alternative antibiotic therapy had failed to treat the infection.

98.    In the United Kingdom, the Committee on Safety of Medicines published data in 1985 about deaths that were associated with cotrimoxazole, ampicillin and trimethoprim. There were 50 deaths due to blood dyscrasias and 14 deaths due to skin reactions, which were attributable to co trimoxazole therapy. Overall, co-trimoxazole was associated with a seven-fold greater incidence of deaths (1.42 per million prescriptions) compared with ampicillin (0.18 per million prescriptions), with a 15-fold greater incidence in patients of over 65 years of age.

99.    By 1985, the U.K. drug regulatory authorities had required warnings Bactrim was particularly likely to have higher risks of adverse events and deaths in patients over the age 65. Some physicians believed that Bactrim should either be restricted or withdrawn from the market. By 1986, the British National Formulary advised that Bactrim should only be used if other safer alternatives had failed.

100.    No such warnings, or restrictions for use were never implemented nor disclosed by Defendants for their U.S. products.

101.    In 1995, the U.K. drug regulatory authority furthered narrowed the approved indications for Bactrim after the SCAR study published its results on the increased risks of SJS and TEN associated with Bactrim.

102.   By mid-1995, the U.K. Committee on the Safety of Medicines (CSM), which is the equivalent to the FDA in the U.S., reported that there were 127 deaths (71% in patients over the age of 60 years old) associated with Bactrim, and 15 deaths associated with TMP alone. Many of the deaths were due to serious skin reactions like SJS and TEN. They recommended that Bactrim not be used as a first or second line agent in the elderly due to the increased risks of serious and fatal reactions involving SJS and TEN.

103.   The U.K. drug regulatory authorities required labeling that said that apart from pneumocystis carinii pneumonia, that Bactrim should not be used for first line therapy for its other approved indications, including urinary and respiratory infections. TMP was cited as having a lower risks for cutaneous reactions by itself.

104.   Sulfonamides, including Bactrim, are no longer on the market in Sweden and Finland where they have been removed.  The use of Bactrim is rarely used any longer as a first or second line therapy due to restrictions of use by the drug regulatory authorities in Europe.  Also, antibiotic resistance in some countries, coupled with the higher risks of cutaneous toxicity has led to some regulatory authorities further restricting the approved indications in different countries outside of the U.S.

105. In Germany during the mid-1980's, several physicians published concerns about the risks exceeding the benefits of using Bactrim for infections.  In fact, they proposed that Bactrim, due its lethal complications like SJS and TEN, should be restricted, and other safer alternatives used to treat the infection. German

physicians called for Bactrim to be restricted in use in the elderly, like the U.K. and Sweden had already done.

106.   By 1990, Dr. Roujeau and colleagues in France were noting that the high frequency and risks associated with Bactrim therapy had led to several European restrictions of the use of Bactrim.

107.   Since 1990, other foreign drug regulatory authorities have required better warnings in foreign countries than the labeling in the U.S. of Bactrim.   Plaintiffs contend that Defendants engaged in fraud and misrepresentations in the safety of the product as described in the U.S. labeling, when the foreign labeling provides more safety information, warnings, and restrictions of use that should have been disclosed to U.S. prescribing physicians, including Decedent's, but these risks were not disclosed because the fraudulent concealment by Defendants.

**J. Defendants Consciously Failed to Provide Physicians with Accurate and Essential Scientific Information for the Safe and Effective use of Bactrim and Fraudulently Concealed, or Misrepresented the Safety of Bactrim**

108.   Defendants were under a duty to ensure that the prescription Bactrim drug product labeling was accurate and contained the essential scientific information for the safe and effective use of the drug. (See C.F.R. 201.56)

109.   Defendants are under a duty to distribute adequate, up to date, complete and accurate labeling, including using and disseminating Dear Doctor letters to update prescribers and patients about new safety information that alters the risk-benefit profile of the drug for its approved indications.

110.   Under the *Code of Federal Regulations*, Defendants, as an NDA holder or an RLD, or distributor or marketer of Bactrim, have a duty to ensure its product label for Bactrim provided accurate and not misleading safety information to the medical community to ensure that they are accurate, adequate, and not false or misleading in any particular.

111.   Defendants also have a duty to conduct sufficient post market safety surveillance; to review all adverse drug event information (ADE); and to report any new safety information bearing on the risk-benefit profile and/or the risks of serious side effects caused or associated with Bactrim to the medical community, Decedent's physician, Decedent and other foreseeable users of Bactrim.

112.   Under the *Code of Federal Regulations*, if Defendants, as the NDA holder, or distributors for both branded drug products discovers pertinent safety information in the course of the fulfillment of its duties as outlined above, Defendants must report that safety information to the medical community, Decedent's physicians, Plaintiffs and other foreseeable users of Bactrim to ensure that its safety information, or warnings, or directions for use are continually accurate and adequate, and not false or misleading in any particular of the labeling. (*See* C.F.R. 201.56-201.57 and 314.80-81.)

113.   Defendants breached their duty to the medical community, Decedent's physicians, and to Plaintiffs, and other foreseeable users of Bactrim, similarly situated because they failed to provide truthful, adequate, and accurate warnings, precautions,

directions for use and limitations of use, and warnings and precautions and information to patients about at-risk populations.

114.    Defendants breached their duty to the medical community, Decedent's physicians, Plaintiffs and other similarly situated foreseeable users because they failed to conduct premarketing and post market safety assessments/surveillance of Bactrim and failed to report all of the significant safety and efficacy data regarding the adequacy and/or accuracy of its warnings, efficacy, or safety of Bactrim to prescribing physicians, including Decedent's prescribing physicians, and to the medical community within the U.S. and the State of California.

115.    Defendants breached their duty to the medical community, Decedent's physician, Decedent and other similarly situated foreseeable users because they failed to adequately assess and review all published scientific literature, including case-control studies, case series an case reports that detailed significant new safety information about SCAR events like SJS and TEN, and to report that safety information by reviewing the safety information in conjunction with evaluating the adverse drug experience reports (ADEs) (both before approval and after approval of Bactrim) and to report any new safety information bearing upon the adequacy and/or accuracy of its warnings, efficacy, or safety, including the risks and/or prevalence of side effects caused by Bactrim through its reporting to the FDA and to the medical community in its respective labeling.

116.    Defendants breached their duty to the medical community, Decedent's

physicians, Decedent and other similarly situated foreseeable users because they failed to periodically review all medical literature and failed to report any significant data concerning the efficacy or safety of Bactrim and the severe side effects as described herein (including, but not limited, to SJS and TEN, and other SCAR events), regardless of the degree of significance, especially about the at-risk populations, or restrictions of use in foreign countries related to increased risks of SCAR events, and the increased frequency and relative risks for SCAR, like SJS and TEN, compared to safer and equally effective antibiotics that had lower risks of SJS and TEN compared to Bactrim.

117.  If a drug company learns of side effects, risks or misleading and inaccurate information in the label, it must request and/or submit labeling revision for the drug under the FDA regulations and schema as soon as reasonably possible from any source in the world for the innovator to present new safety information and request labeling changes for all products, both innovator and generic.

118.  Defendants knew or should have known about the side effects, risks, and misleading and inaccurate information contained in its Bactrim label, yet knowingly, consciously withheld or fraudulently concealed that information and/or failed to report that information to the medical community, Decedent's physicians, Decedent and other similarly situated foreseeable users.

119.  At all times material hereto, Defendants were aware of the increased magnitude of the higher relative risks, absolute risks, reporting rate, and higher

number of fatalities, and disproportionate risks to subpopulations associated with the more serious side effects caused by Bactrim, including SCAR events such as DRESS, SJS and TEN; including, but not limited to, the severe side effects described herein yet failed to fulfill its obligation to report, disseminate and divulge such safety and prescribing information or otherwise educate physicians and users of the higher risks of SCAR events and fatalities, and disabling sequelae associated with SCAR side effects, and in doing so, engaged in fraud and misled the medical community, Decedent's physicians, Plaintiffs and other similarly situated foreseeable users about the safety of the use of the drug.

120.   At all times material hereto, Defendants knew or should have known that physicians were not aware of, or did not fully appreciate, all of the quantifiable risks and the higher degree of the risks and seriousness of SJS and TEN as associated with use of Bactrim, as a result of the negligent misrepresentation and fraud, and off-labeling promotion by Defendants.

121.   Defendants knew or should have known that the package insert, patient leaflet , product websites, and the Physician Desk Reference monograph for Bactrim, along with the corresponding generic versions, did not adequately inform physicians or patients, about all of the higher risks of severe side effects, including SCAR adverse events, associated with Bactrim that are described herein, including those related to SJS and TEN.  Defendants, however, failed to communicate said safety and prescribing information to the medical community, Decedent's physicians, Decedent

and other similarly situated foreseeable users, and in doing so, engaged in fraud and misled them about the safety of the use of their drug.

122.    Defendants knew, or should have known through the exercise of reasonable care, that the package insert for Bactrim and its generic versions, substantially failed to state at all anything about the causal relationship, and/or grossly understated, the relative risks and/or degree of risks and/or prevalence of the risk of severe side effects specifically associated with Bactrim, and that Bactrim posed significantly higher risks to those subpopulations (Females and the elderly) who were potentially at higher risks associated with Bactrim that are described herein, including those related to SJS and TEN.

123.    Defendants willfully, and in wanton disregard of the rights of Decedent and Plaintiffs and other persons in Plaintiffs' class, failed to disclose and communicate material safety information regarding the risks of their drug to the medical community, Decedent's physicians, Decedent and other similarly situated foreseeable users, knowing that such failure would result in serious injury and fatalities, or with severe permanent and irreversible disabilities and physical disfigurement to patients who were prescribed Bactrim by a physician who was not aware of the higher risks, relative risks, absolute risks, risk factors or at-risk populations regarding the risks of SJS and TEN.  Defendants falsely and fraudulently represented to the medical community, Decedent's physicians, Decedent and other similarly situated foreseeable users that Bactrim was safe to use and that permanent

and the severe side effects described herein (including SJS and TEN) were rare and/or infrequent and/or unpredictable and/or could not be estimated, when in fact, they had been estimated determined to be not rare, and were the highest of any other drug sold in the world, and much higher risks compared to other safer alternative antibiotics to treat the same indications, but with dramatically lower risks of SCAR events.

124. Defendants did not disclose or warn physicians about the actual prevalence, frequency, or predictability of known side effects of Bactrim when it is used as marketed by Defendants, or when used in patients such as Decedent, all of which were foreseeable.

125. At the time Defendants made the above-described representations, Decedent's physicians were not aware of the falsity of the representations and reasonably believed them to be true. In fact, Defendants knew that prescribing physicians were unaware of the relative risks or absolute risks and frequency of SJS and TEN associated with Bactrim because Defendants willfully and fraudulently concealed such risks from them.

126. Plaintiffs' and Decedent's serious injuries, as described above, came about as a foreseeable and proximate result of Defendants' failure to correct fraudulent, false and misleading information it disseminated to physicians, which contained inaccurate, misleading, deceptive, materially incomplete, false and/or otherwise inadequate information concerning the efficacy, safety and potential side effects of Bactrim.

127.   Defendants had a duty to ensure that it had a reasonable basis for making the representations it did regarding the safety, efficacy, risks and benefits of Bactrim, to ensure such representations by Defendants were accurate, and to exercise reasonable care in making those representations so as to not make misrepresentations, all of which it negligently and/or intentionally failed to do, as more fully discussed below.

128.   Defendants all knowingly made false, fraudulent representations, and concealed risks to physicians, pharmacies, Decedent, Plaintiffs and other situated in California that affected the safety of their drug Bactrim starting in 2004 leading up to Decedent's prescription on or about October 27, 2022 in the following respects:

- They knew that the use of Bactrim had been restricted for use after it was approved to treat infections in countries outside of the U.S. (foreign countries), primarily due to increased risks of SCAR events changed the risk-benefit profile, that Bactrim was restricted to only be used after safer alternatives had been tried and failed, and restricted in use for only severe infections, and was restricted for use only to treat pneumocystis cariini in certain patients, and that indications for traveler's diarrhea or otitis media were restricted as well due to increased risks of SCAR events, and that these higher risks exceeded the benefits for infection, and that exposure could result in unacceptable risks and fatalities and serious outcomes for adults and pediatric population;

- They knew that Bactrim carried the highest risks of SJS and TEN over any other drug marketed in the world, and higher risks for SJS and TEN or SCAR than any other antibiotic, and that Bactrim had higher risks of SJS and TEN compared to safer antibiotic therapies that could be used to treat the same infections that it was approved for, but did not disclose this new risk-benefit profile to prescribers in the U.S., including Decedent's prescribing physician;

- That the Defendants knew that Bactrim had been restricted in Ex-U.S. Countries and not recommended for use for uncomplicated infections outside of the U.S. due to its higher risks of SCAR, and that it no longer was

recommended to be used for those types of infections; yet Defendants did not disclose those higher risks, and at-risk populations in the U.S. labeling, as Defendants did in their foreign labeling for the last 20 years;

- That Defendants knew that the frequency or incidence of SCAR, including SJS and TEN was much higher than what the current labeling reported, and that these risks were also higher in certain at-risk groups, including (Females and the elderly) who have higher incidence/frequency and risks of SCAR, including SJS and TEN;

- They knew that due to these higher risks in subpopulations, that Bactrim carrying the highest risk of SJS and TEN falsely represented that Bactrim was safer, or as safe, than the comparable antibiotics that could be used to treat the same infections, when in reality it was not safer than or equal to the safety of the other available antibiotics, which carried a much lower or negligible risks of SJS and TEN. They knew that the use of Bactrim should have been restricted in these subpopulations, including the elderly, but did not inform the prescribing physicians or patients about the higher risks that was not disclosed in the Bactrim labeling, including in any Dear Doctor letter, educational initiatives or patient information leaflets.

- Despite that knowledge of higher risks, defendants failed to adequately inform the medical community or public of the dangers from higher risks of serious skin reactions and complications in these subpopulations (Females and the elderly) and instead misrepresented in a fraudulent manner that it was safe;

- They knew that Bactrim had been restricted for use in foreign countries for the very same indication that it was approved in the U.S., and concealed that such restrictions had not been disclosed in the U.S. labeling to allow for better informed choices about alternative antibiotics that were available to be used in patients like Decedent that had lower risks of SCAR events, especially in the at-risk populations of elderly females in which the Decedent belongs to those at-risk populations, and yet Defendants still falsely marketed and represented that Bactrim was safe for its use for uncomplicated infections, or in these subpopulations, when it was not;

- Defendants actively promoted the dangerous off-label use in contradiction with the warning label.

- Rather, to increase profits, they affirmatively furthered the inappropriate use of Bactrim for use in all of these subpopulations without recommending the use of

other safer alternative antibiotics, instead of just recommending the use of the single agents of this combination drug product, and by making oral and written representations to physicians that it was safe to use Bactrim, or a single ingredient between the two, when the risks were higher than disclosed for SJS and TEN; and fraudulently concealed such risks from prescribers and patients;

- Prescribing doctors and their patient, Decedent reasonably relied on Defendants' representations in October 2022 about the safety of Bactrim and that it was safe for an elderly female who was a minority, when it was not safe;

- Decedent's exposure to Bactrim in fact resulted in skin reactions and complications therefrom leading to serious injuries and death;

- In 2018, members of the RegiSCAR group published their case-control study evaluating the updated risks of SJS and TEN with drugs. They found that SMX-TMP had 1000 times greater risks of SJS and TEN than previously detected. These increased risks of SJS and TEN being 1000 times higher was newly acquired safety information that should have been updated into the labeling for the branded drug Bactrim;

- Bactrim induced TEN reactions were more likely to cause death in patients than previously thought. This information should have been updated into the labeling for the branded drug Bactrim;

- It was foreseeable to each Defendant that consumption of Bactrim, or its generic equivalent by elderly females may result in higher morbidities and fatalities associated with SCAR, their complications or treatments, and increased risks to this population like Decedent.

129.   Decedent would not have suffered injuries but for the above acts of negligence, negligent misrepresentations, fraud, concealment, intentional misrepresentations, actions, and omissions of Defendants, separately or collectively.

### K. Decedent's Prescribing Physician Relied on Defendants' False and Misleading Safety Information

130.   On or about October 27, 2022, Decedent's prescribing physician assessed the risks and benefits of the use of Bactrim for Decedent.   In evaluating the

appropriate medication for Decedent, her prescribing physician intended to select the medication that would be the most tolerable, had the lowest potential for harm, the least likelihood of negatively impacting her quality of life, and which would be effective.

131.    For the purpose of assessing the risks and benefits of prescribing Bactrim on or about October 27, 2022 (the date of prescription) to Decedent for her infection, Decedent's prescribing physician, from her clinic in California, relied on her education, training and experience; information from the product label for Bactrim; Defendants' sponsored medical and pharmaceutical websites, including Defendants' online websites and labeling information regarding Bactrim available on medical phone and computer-based mobile applications; presentations to Kaiser Permanente pharmacy departments or units, continuing medical education conferences where Bactrim was discussed; and written materials, including labeling and safety information provided by Defendants to the physician group, hospitals, HMOs or other related entities by which decedent's prescribing physician was licensed, contracted or had credentialed him, or where he served as involved with his clinical practice with respect to providing pharmaceutical drugs and therapeutics information regarding Bactrim, among other documents and communications. Defendants made the misrepresentations above to Decedent's prescribing physician in California, including but not limited to circulating their offending label and related misleading safety communications in California to California prescribing physicians,

knowing the California prescribing physicians would rely on them in California when prescribing Defendants' drug to California residents.

132.    Much of the safety information regarding the higher risk of SJS and TEN from Bactrim does not appear in family medicine/internal medicine journals; rather, it is published in medical journals either outside of the family medicine/internal medicine medical community (such as in dermatology, rheumatology, or nephrology journals), or they have appeared in international dermatology journals.  Particularly due to the high risk of SJS/TEN Bactrim presents to its users, the SCAR-related safety information identified in this Complaint should have been (but was not) disclosed by Defendants to Decedent's prescribing physician.

133.    Decedent's prescribing physician was not advised by Defendants of any comparative risk analyses for serious skin reactions, such as SJS and TEN, among the different infection medications nor was she made aware of the information contained in ¶128.

134.    In addition to the foregoing, at the time she prescribed Bactrim to Decedent, Decedent's prescribing physician was exposed to and relied upon the omissions, misrepresentations and fraudulent concealment in the Bactrim labeling, including the oral and written materials sponsored and distributed by Defendants, and other materials as summarized in ¶128 and throughout this Complaint.  Decedent's prescribing physician would not have prescribed Bactrim to Decedent had she known

of the new material safety data and information described herein regarding Bactrim, that was undisclosed.

135.    Decedent's prescribing physician relied on Defendants to fully and accurately disclose Bactrim's SCAR-related safety data.  At the time she prescribed the drug to Decedent, Decedent's prescribing physician was not aware of the falsity of the misleading safety information above or Defendants' omission from and affirmative misrepresentations contained in the prescribing information with regard to SCAR events, SJS and TEN.  As a practicing physician, Decedent's prescribing physician has the option to prescribe a large volume of different drugs to her patients. It is impractical to place the burden on or expect every physician to manage a medical practice, effectively treat their patients, and review all of the available safety literature regarding every drug that may be applicable to their practice.  These obvious impracticalities are, in part, why federal regulations place the burden solely on drug companies like Defendants to disclose all material safety information regarding the safe use of their drugs pursuant to 21 C.F.R. §1.21 and 201.56-201.57, and 201.80.  It is Decedent's prescribing physician practice to rely on safety information provided by drug companies like Defendants (including but not limited to prescribing information disseminated in labeling and written materials, DHCP letters, medical Kaiser education programs, literature and communications, labeling and safety information available on online medical information and applications, symposiums and medical conferences), and she was exposed to, reviewed and relied

upon the safety information referenced above when she was analyzing the safest and most effective infection medications for Decedent in October of 2022. Had the label for Bactrim, DHCP letters, medical journals, physician education programs, literature and communications, Kaiser symposiums or medical conferences accurately disclosed the risk of SJS/TEN or SCAR events and other information, Decedent's prescribing physician would not have prescribed the drug to Decedent. Defendants should have expected physicians to rely upon the safety information contained in the Bactrim label and prescribing information (and on which Decedent's prescribing physician did in fact rely), when she and other physicians prescribe Bactrim (including Decedent's prescribing physician's prescription to Decedent).

136. At the time Defendants made the above-described representations and nondisclosures, Decedent and her prescribing physician were ignorant of the falsity of the representations and reasonably believed them to be true. In fact, Defendants knew that prescribing physicians were unaware of the new safety information of high relative risks and excessively high incidences of SJS and TEN associated with Bactrim and Defendants willfully and fraudulently concealed such risks from them.

137. Decedent's serious injuries, as described above, came about as a foreseeable and proximate result of Defendants' failure to correct false and misleading information they disseminated to physicians, which contained inaccurate, misleading, deceptive, materially incomplete, false and/or otherwise inadequate information concerning the efficacy, safety and potential side effects of Bactrim.

138. But for the above misrepresentations, actions, and omissions of Defendants, Decedent and Plaintiffs would not have suffered the catastrophic and permanent injuries giving rise to this case.

## V. CAUSES OF ACTION

### A. Negligence and Negligent Failure to Warn

139. Plaintiffs incorporate by reference each and every paragraph of this Complaint as though set forth in full herein.

140. Defendants owed a duty of care to Decedent and Decedent's prescribing physician in all aspects of the testing, labeling, distribution, marketing, and sale of Bactrim to ensure the safety of their drug, its labeling and marketing materials contained accurate information and instructions for the use of Bactrim.

141. As a direct and proximate cause of Defendants' conduct, Plaintiffs have suffered and will continue to suffer injury, harm, and economic loss as alleged herein, including a permanent and substantial physical disability, and expenses attributable to Decedent's SJS and TEN and her death.

142. Defendants owed a duty toward foreseeable users of Bactrim and its generic form, including Plaintiffs, Decedent, and her prescribing physician, to exercise reasonable care to ensure that the Bactrim labeling and prescribing information adequately informed prescribing physicians regarding the potential

effects of using the products in ordinary and foreseeable ways, in particular the risks of SJS/TEN and other risks identified above.

143.   Defendants failed to exercise reasonable care in testing Bactrim for side effects in ordinary and foreseeable users, failed to disseminate to physicians information concerning the effects of Bactrim which would have rendered the label accurate and not misleading, and would have enabled physicians to make informed choices concerning the use of Bactrim and its generic form.  Defendants should have foreseen that generic drug manufacturers would not change the generic Bactrim labeling and related safety information created and distributed by Defendants and, instead, would have included those same warnings and safety information in the Bactrim label and safety information.

144.   Defendants failed to exercise ordinary care in the marketing, testing and labeling of the drug in that Defendants knew or should have known that Bactrim created a foreseeable high risk of unreasonable, dangerous side effects and health hazards.

145.   The dangerous propensities of Bactrim, as referenced above, were known or scientifically knowable, through appropriate research and testing, to Defendants at the time Defendants distributed, supplied, or sold the products and accompanying labeling and prescribing information, and not known to ordinary physicians who would be expected to prescribe the drug for Decedent and other patients, similarly situated.

146.    The information Defendants disseminated to physicians concerning Bactrim was, in fact, inaccurate, misleading, and otherwise inadequate, as summarized in ¶128 and throughout this Complaint.

147.    As a proximate result, Plaintiffs and Decedent suffered injuries and consequent economic damages and other medical expenses in the past, following Decedent's prescribing physician's prescription for Bactrim, Decedent's ingestion of the generic form of Bactrim, and her death.

148.    As a direct and proximate result of the acts and omissions of Defendants, including but not limited to Defendants' negligent conduct as described herein, Decedent's prescribing physician prescribed Bactrim to her, which was causally related to and contributed to Decedent's severe skin reaction and death described above.

149.    In addition to the facts and allegations set forth above, Decedent's prescribing physician reasonably relied on the Bactrim safety information sponsored and distributed by Defendants including the product label, , and other distributed verbal and written safety information (both online and in print) in deciding to prescribe Bactrim to Decedent.  Defendants' misrepresentations and omissions in the labeling, patient information leaflet, and other distributed verbal and written safety information, as well as their failure to send a Dear Healthcare professional letter, were substantial factors in inducing Decedent's prescribing physician to prescribe Bactrim to her in lieu of other safer drugs.

150.   Plaintiffs seek judgment against Defendants for all damages in an amount which will compensate Plaintiffs and Decedent for their injuries.

## B. Negligent Misrepresentation

151.   Plaintiffs incorporate by reference each and every paragraph of this Complaint as though set forth in full herein.

152.   Defendants owed a duty to disseminate accurate and adequate information concerning Bactrim, and to exercise reasonable care to ensure that it did not, in those undertakings, create unreasonable risks of personal injury to others.

153.   Defendants disseminated to physicians (including Decedent's prescribing physician), through package inserts, and/or the publication of a PDR monograph, and/or otherwise mediums, information concerning the properties, safety profile and effects of Bactrim, with the intention that physicians (including Decedent's prescribing physician) would rely upon that information when making a decision concerning whether to prescribe Bactrim for their patients.

154.   Defendants as drug manufacturers and/or distributors, knew or ought to have realized that the manufacturers and/or distributors of drug products have a duty to ensure that the information contained in the package inserts, patient information leaflets accompanying their own prescription drug products is accurate, complete, not misleading, and otherwise adequate, and to monitor medical literature and post marketing adverse events and to report any data affecting the safety of the drug to the

appropriate agency and/or alert the medical community, Decedent's physicians, and through them directly to Decedent.

155.    Defendants knew or ought to have realized that physicians, in weighing the potential benefits and potential risks of using Bactrim and in writing prescriptions for Bactrim would rely upon information disseminated to them by the brand manufacturer of the drug product, regardless of whether the prescriptions might be filled with either the name brand product or generic Bactrim, and that many patients, in accordance with those prescriptions, would be likely to ingest Defendants' drug product or a generic form of Bactrim.

156.    Defendants knew or ought to have realized that patients receiving prescriptions for Bactrim written in reliance upon information they disseminated as the manufacturer/distributor of Bactrim would be placed in peril of grievous personal injury if the information thus disseminated and relied upon was materially inaccurate, misleading, or otherwise false.

157.    Defendants made the misrepresentations as summarized in ¶128 and throughout this Complaint without any reasonable ground for believing them to be true.    These misrepresentations were made directly by Defendants, by sales representatives, and other authorized agents of Defendants and in publications and other written materials directed to physicians (including Decedent's prescribing physician), patients, and the general public with the intention of inducing reliance on and the prescription, purchase, and use of Bactrim.

158.   The representations by Defendants were in fact false and misleading and were intended to induce reliance on those misrepresentations and the purchase and use of Bactrim and, as a result, Defendants knew or should have known that those misrepresentations would have resulting in the ingestion of the generic form of the drug by consumers such as Decedent.  Had Decedent or her prescribing physician known of the true facts and those facts concealed by Defendants, Decedent's prescribing physician would not have prescribed Bactrim and Decedent would not have ingested the generic form of Bactrim.  The reliance by Decedent and her prescribing physician on Defendants' misrepresentations was justified because such misrepresentations were made and conducted by Defendants, who were in a position to know and did know the true facts.

159.   As a proximate and foreseeable result of the negligent misrepresentations of Defendants, Plaintiffs and Decedent suffered grievous bodily injury, consequent economic and other loss, medical expenses in the past and death, as described above, when Decedent's physician, in reasonable reliance upon the negligently inaccurate, misleading, and false information disseminated by Defendants, and believing the information to be true, prescribed for Decedent the use of Bactrim and Decedent ingested the generic version of Bactrim, leading to Plaintiffs and Decedent's injuries.

160.   In addition to the facts and allegations set forth above, Decedent's prescribing physician reasonably relied on the Bactrim safety information sponsored

and distributed by Defendants including the product label, patient information leaflet, and other distributed verbal and written safety information (both online and in print) in deciding to prescribe Bactrim to Decedent.  Defendants' misrepresentations and omissions in the labeling, and other distributed verbal and written safety information, as well as its failure to send a Dear Healthcare professional letter, or notifications to physicians were substantial factors in inducing Decedent's prescribing physician to prescribe Bactrim to Decedent in lieu of other safer drugs.

161.   Plaintiffs seek judgment against Defendants for all damages in an amount which will compensate Plaintiffs and Decedent for their injuries.

## C. **Gross Negligence**

162.   Plaintiffs incorporate by reference each and every paragraph of this Complaint as though set forth in full herein.

163.   Defendants had the duty to exercise reasonable care in testing, manufacturing, marketing, labeling, selling, and/or distributing Bactrim including a duty to ensure that Bactrim did not cause users to suffer from unreasonable and dangerous side effects.

164.   Defendants failed to exercise reasonable care in testing, manufacturing, marketing, labeling, selling, and/or distributing Bactrim for the reasons set forth above.  More specifically, Defendants failed to exercise reasonable care by failing to conduct adequate pharmacovigilance and safety signal analysis, and then sat on new

safety information they knew should have been provided in updated labeling to U.S. prescriber, including to Decedent's prescribing physician, by and through the acts summarized in ¶128 constitute gross negligence by the Defendants.

165.  As a direct and proximate result of the Defendants' sale of Bactrim without adequate warnings, Plaintiffs and Decedent suffered harm as alleged herein.

166.  As a direct result of Defendants' gross negligence, willful and wanton misconduct, and/or other wrongdoing and actions, which constitute a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences, Plaintiffs and Decedent suffered tremendously as alleged herein.

167.  Defendants continued to promote the efficacy and safety of Bactrim, while providing little or no warnings, and downplayed the risks, even after Defendants knew of the risks and injuries associated with its use.  Defendants' conduct was committed with knowing, conscious and/or deliberate disregard for the rights and safety of consumers such as Decedent, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and deter Defendants from similar conduct in the future.

## D. Fraud and Fraud by Concealment

168.   Plaintiffs incorporate by reference each and every paragraph of this Complaint as though set forth in full herein.[10]

169.   Defendants made misrepresentations of material facts to, and omitted and/or concealed material facts from, various entities and individuals during the life cycle of Bactrim, including Decedent's prescribing physician, in the promotion, advertising, marketing, labeling, distribution and sale of Bactrim, including but not limited to its efficacy and safety, adequate directions for use and SCAR-related information misrepresented in and withheld from the Bactrim prescribing information.

170.   From 2004-2022, by and through the Defendants disseminating false and misleading prescribing information also known as professional labeling for each year to U.S. prescribing physicians when they knew that new safety information they knew existed, but had not updated to California physicians, including to Decedent's prescribing physician and Kaiser Permanente, rendered the Bactrim label false and misleading, and the mere virtue of Defendants during these same years by attaching the false and misleading label to the units of Bactrim shipped to the State of California to the pharmacies based in California, including the one where Decedent obtained up the Bactrim, or to California physicians like Decedent's prescribing physician.  Defendants deliberately and intentionally misrepresented to, and omitted and/or concealed material facts from, Decedent's prescribing physician and, instead,

---

[10] Plaintiffs are not bringing a claim for fraud on the FDA but are addressing Defendants' anticipated claims of federal preemption.

represented that Bactrim was safe when used as intended and downplayed the serious risks of SJS and TEN, when the new safety information rendered the professional label fraudulent based on the lack of the disclosure to the prescribing physician, to decedent, and to all physicians practicing in the State of California.

171.   The identities of the individuals at Defendants who committed the fraud and located within the Defendants' files and, at this time, unavailable to Plaintiff. While Plaintiff is not required to identify the individual participants in the fraud by name at this time, Plaintiff alleges on information and belief that Defendants' Bactrim safety risk leads (or similarly titled role), labeling leads (or similarly titled role) and risk management and labeling executive committee members participated in the fraudulent conduct alleged herein.   Such misrepresentations, omissions, and concealments of facts include, but are not limited to such omissions, concealment and misrepresentations made in the actual labeling disseminated to California healthcare providers, including Decedent's prescribing physician as summarized in ¶128 and throughout this Complaint.

172.   Defendants had a duty to disclose the foregoing risks and failed to do so, despite possession of information concerning those risks.   Defendants' representations that Bactrim was safe for its intended purpose were false and, misleading, as Defendants' product was in fact dangerous.   Moreover, Defendants knew that its statements were false, knew of incidents of serious injuries, such as serious skin reactions, erythema multiforme exudativum, bullous fixed drug eruption,

severe cutaneous adverse reaction, acute generalized exanthematous pustulosis, drug reaction with eosinophilia and systemic symptoms, exfoliative dermatitis, SJS and TEN, associated with Bactrim prior to, and after approval of Bactrim, and knew that their omissions rendered their statements false or misleading.

173.    Defendants also failed to exercise reasonable care in communicating the information concerning Bactrim to Decedent's prescribing physician through its failure to disclose the true risks of SJS and TEN when Defendants' sales representatives detailed Kaiser Permanente or Decedent's prescribing physician in an effort to encourage Decedent's prescribing physician to prescribe more of Defendants' drugs, including Bactrim.

174.    In addition to the facts and allegations set forth above, Decedent's prescribing physician reasonably relied on the Bactrim safety information sponsored and distributed by Defendants including the product label, patient information leaflets, and other distributed verbal and written safety information (both online and in print) in deciding to prescribe Bactrim to Plaintiff.  Defendants' misrepresentations and omissions in the labeling, patient information leaflet, and other distributed verbal and written safety information, as well as its failure to send a Dear Healthcare professional letter, were substantial factors in fraudulently inducing Decedent's prescribing physician to prescribe Bactrim to Plaintiff in lieu of other safer drugs.

175.    Decedent's prescribing physician was not aware of the falsity of the foregoing representations, nor was Decedent's prescribing physician aware that

material facts concerning the safety of Bactrim had been concealed or omitted. In reliance upon Defendants' misrepresentations (and the absence of disclosure of the serious health risks), Decedent's prescribing physician prescribed Bactrim to Decedent and Decedent ingested Bactrim and was seriously and permanently injured. Had Decedent's prescribing physician known of the true facts concerning the risks associated with Bactrim, Decedent's prescribing physician would not have prescribed the drug and Decedent would not have ingested Bactrim and would not have sustained a SJS and TEN reaction resulting in death.

176. The reliance by Decedent's prescribing physician upon Defendants' misrepresentations was justified because the misrepresentations and omissions were made by individuals and entities that were in position to know the true facts concerning Bactrim. Decedent's prescribing physician was not in position to know the true facts because Defendants' label did not accurately disclose the risk of SCAR events, including SJS and TEN, and instead Defendants aggressively promoted Bactrim to Decedent's prescribing physician and other prescribers. As a direct and proximate result of Defendants' misrepresentations and/or concealment, Plaintiff and Decedent suffered injury and harm as alleged herein.

177. Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with conscious disregard of the rights and safety of consumers such as Plaintiff and Decedent. Plaintiff is not alleging any cause of action for fraud on the FDA.

178.    Plaintiff seeks judgment against Defendants for all damages in an amount which will compensate Plaintiff and Decedent for their injuries.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

1.    Compensatory, actual, and punitive damages, according to proof at trial;

2.    Survival, Loss of consortium and wrongful death damages according to proof at trial;

3.    Attorney's fees, costs and costs of suit; and

4.    Such other and further relief as the Court deems appropriate.

DATED: September 12, 2024

Respectfully submitted,

**WORMINGTON & BOLLINGER**


＿＿/s/ Lennie F. Bollinger＿＿＿＿＿＿
Lennie F. Bollinger, Texas Bar No. 24076894*
LB@wormingtonlegal.com
212 E. Virginia Street
McKinney, Texas 75069
Telephone (972) 569-3930
Facsimile (972) 547-6440
*Pro Hac Vice application to be filed*

**SINGLETON SCHREIBER, LLP**

  /s/ Srinivas "Vas" Hanumadass
Srinivas "Vas" Hanumadass, California Bar No. 228547
vas@singletonschreiber.com
145 S. Spring Street, Suite 850
Los Angeles, California 90012
Telephone: 310-455-8351
Facsimile:  619-704-3552

Benjamin Siminou, California Bar No. 254815
bsiminou@singletonschreiber.com
591 Camino de la Reina, Suite 1025
San Diego, California 92108
Telephone (619) 704-3288
Facsimile (619) 704-3552

**ATTORNEYS FOR PLAINTIFFS**

1

## **JURY TRIAL DEMANDED**

2

Plaintiffs demand a jury trial on all triable issues.

3

DATED: September 12, 2024                    Respectfully submitted,

4

**WORMINGTON & BOLLINGER**

5

6

__/s/ Lennie F. Bollinger_____
Lennie F. Bollinger, Texas Bar No. 24076894*
LB@wormingtonlegal.com

7

212 E. Virginia Street
McKinney, Texas 75069

8

Telephone (972) 569-3930
Facsimile (972) 547-6440

9

*Pro Hac Vice application to be filed*

10

**SINGLETON SCHREIBER, LLP**

11

__/s/ Srinivas "Vas" Hanumadass_____
Srinivas "Vas" Hanumadass, California Bar

12

No. 228547
vas@singletonschreiber.com

13

145 S. Spring Street, Suite 850
Los Angeles, California 90012

14

Telephone: 310-455-8351
Facsimile: 619-704-3552

15

Benjamin Siminou, California Bar No. 254815

16

bsiminou@singletonschreiber.com
591 Camino de la Reina, Suite 1025

17

San Diego, California 92108
Telephone (619) 704-3288

18

Facsimile (619) 704-3552

19

**ATTORNEYS FOR PLAINTIFFS**

20

21

PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND